**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———

**No. 21-2183**

———

JUILIANA SWINK, Administratrix of the Estate of David Ray Gunter,

Plaintiff - Appellant,

v.

SOUTHERN HEALTH PARTNERS INC.; JASON JUNKINS, Medical Director; DAVIE COUNTY; ANDY STOKES; CAMERON SLOAN; STOKES COUNTY; MIKE MARSHALL; ERIC CONE; SANDRA HUNT; FRAN JACKSON; WESTERN SURETY COMPANY; MANUEL MALDONADO; DOE DEFENDANTS; OHIO CASUALTY INSURANCE COMPANY,

Defendants – Appellees,

and

DR. MANDY K. COHEN, Secretary of DHHS; DEPARTMENT OF HEALTH AND HUMAN SERVICES,

Defendants.

———

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro. William L. Osteen, Jr., District Judge. (1:16-cv-00262-WO-JLW)

———

Argued: October 30, 2024                    Decided: November 20, 2025
                    Amended: December 2, 2025

———

Before GREGORY, RICHARDSON, and BENJAMIN, Circuit Judges.

———

Affirmed in part, reversed in part, and remanded by published opinion. Judge Gregory wrote the opinion, in which Judge Benjamin joined. Judge Richardson wrote a separate opinion, concurring the judgment in part and dissenting in part.

———

**ARGUED:** David W. McDonald, MCDONALD WRIGHT LLP, Greensboro, North Carolina, for Appellant. James G. Long, III, MAYNARD NEXSEN PC, Columbia, South Carolina; Bradley O. Wood, WOMBLE BOND DICKINSON (US) LLP, Winston-Salem, North Carolina, for Appellees. **ON BRIEF:** Brittany N. Clark, NEXSEN PRUET, LLC, Columbia, South Carolina, for Appellees Southern Health Partners, Inc.; Jason Junkins; Sandra Hunt; Fran Jackson; and Manuel Maldonado.

2

GREGORY, Circuit Judge:

## I.

Appellant David Ray Gunter was diagnosed with a heart condition shortly after birth. J.A. 669, Deposition of David Ray Gunter ("Gunter Dep.") 35:14–23. At fifteen years old, to address his heart condition, Gunter underwent open-heart surgery to replace his aortic valve with a mechanical heart valve ("MHV"). J.A. 670, Gunter Dep. 36:7–11. At this time, Gunter was also prescribed Coumadin, an anticoagulant or blood thinner, which reduces the formation of blood clots. *Id.* Gunter "faithfully and regularly took his Coumadin dosage at a set hour every day" and such regimen "was effective and [Gunter] did not suffer serious complications from his heart condition provided that he faithfully observed his physicians' instructions." J.A. 245.

Individuals with MHVs have a higher risk of blood clots than those without MHVs. J.A. 2147. To ensure such patients are receiving the appropriate amount of Coumadin, providers monitor the patient's International Normalized Ratio ("INR") range, which indicates, amongst other things, the blood's thickness and clotting factors. *Id.* It is important for individuals with MHVs to maintain levels of anticoagulant within a therapeutic range and that the levels of anticoagulant do not fall above or below the therapeutic range. J.A. 245. An appropriate or "therapeutic" INR level for an individual with an MHV is between 2.5 and 3.5. *See* J.A. 695, Deposition of Virginia Glover Yoder ("Yoder Dep.") 201:14–15; J.A. 1925 ¶ 5. An individual with an MHV that has an INR level below the "therapeutic" range is at risk for clot formation, while an individual with

3

an MHV that has an INR level above the "therapeutic" range is at risk for excessive bleeding. *See* J.A. 682, Yoder Dep. 78:4–2. Gunter typically took Coumadin once per day in the evening. J.A. 674, Gunter Dep. 80:9–10. Over the years, Gunter's daily dosage has fluctuated between 5mg and 7mg per day due to various factors, including financial access to medication, diet, and metabolism needs. J.A. 673, Gunter Dep. 74:19; *see also* J.A. 533.

In early 2012, Gunter was treated by Dr. Virginia Yoder at a Coumadin clinic in North Carolina. J.A. 1977. Due to financial difficulties, Gunter had trouble securing reliable transportation to his appointments, and subsequently, was discharged from the clinic on May 31, 2012 for failure to attend. J.A. 695, Yoder Dep. 201:4–7; *see also* J.A. 1977. Between May 2012 and November 2012, Gunter asserts he provided lawn care services for a doctor, who, in exchange for this labor, provided Coumadin and INR testing. *See* J.A. 1977, 2199.

On November 6, 2012, Gunter was arrested in Forsyth County pursuant to a bench warrant and was temporarily placed at the Forsyth County local confinement facility. J.A. 245; *see also* J.A. 672, Gunter Dep. 54:13–20. When Gunter arrived at the Forsyth County local confinement facility, "he completed a medical intake form, disclosing that he has a heart condition and alerting that he takes Warfarin[1] daily together with other medications and other medical information." J.A. 245.

On the morning of November 7, 2012, Gunter was transferred to Davie County Detention Center ("DCDC"). J.A. 246. Upon his arrival, Gunter was screened by appellee

---

[1] The generic brand of Coumadin is referred to as "Warfarin," and both brands are used interchangeably by the parties' witnesses and district court. *See* J.A. 1218, Gunter Dep. 36:12–15. For consistency purposes, this opinion will only refer to Gunter's prescribed medication as Coumadin.

Fran Jackson, a nurse and the Davie County Medical Team Administrator for appellee Southern Health Partners, Inc. ("SHP"), the contracted medical care provider for DCDC. J.A. 94, 246, 566–77, 675, Gunter Dep. 81:7–14. Gunter advised Jackson that he had an MHV and took Coumadin, which she noted in his medical record. J.A. 94, 532–33. Jackson further noted that Gunter advised he would have his medications brought to DCDC if he was not released and advised Jackson to call his doctors if he was not released. J.A. 533. Gunter states Jackson was not "very nice" and "when she listened to [Gunter's] heart clicking" stated "[j]ust because your heart clicks doesn't mean you have a mechanical heart valve." J.A. 1228, Gunter Dep. 88:17–25.

On the morning of November 8, 2012, Jackson contacted Gunter's primary care physician and pharmacist about his condition. J.A. 533. According to Jackson's notes in the medical records, the clinic where Gunter stated his primary physician worked had last seen Gunter in June 2012 for a sick visit, but otherwise had not managed his INR levels since 2010. *Id.* Jackson's notes in the medical records further indicated the pharmacist informed Jackson that Gunter had last filled a prescription for 1mg of Coumadin on October 19, 2012, and did not have any prescriptions remaining. *Id.* Jackson also received a faxed medical record from a clinic, which indicated Gunter reported taking 7mg of Coumadin by mouth daily.

That same day, Jackson consulted with appellee Manuel Maldonado, a licensed Physician's Assistant and independent contractor for SHP who oversaw medical care at DCDC and Stokes County Detention Center ("SCDC"). J.A. 375; J.A. 648, Deposition of Manuel Maldonado ("Maldonado Dep.") 30:6–24. Maldonado ordered a prescription for 5mg of Coumadin and arranged for Gunter to have an INR test completed on November 13, 2012. J.A.

5

1303–04, Maldonado Dep. 83:20–25, 84:1–5.  Additionally, that same day, Gunter's family delivered Coumadin to DCDC—two 5mg pills and four 1mg pills.  J.A. 540.  Nothing in the record suggests Gunter took or was permitted to take any of the Coumadin pills his family brought for him.  Gunter did not receive any Coumadin on November 7 or November 8 but received 5mg of Coumadin each day from November 9 through November 14, pursuant to the prescription ordered by Maldonado.  *See* J.A. 1303, Maldonado Dep. 83:20–25; J.A. 537.

On November 13, 2012, Gunter had an INR test which showed that his levels were 1.07, well below the therapeutic range.  J.A. 1304–5, Maldonado Dep. 87:2–5, 96:16–20.  As a result, Maldonado modified Gunter's prescription to be increased to 7.5mg on November 15, November 17, and November 19, and remain at 5mg on November 13, November 14, November 16, and November 18.  J.A. 1306, Maldonado Dep. 97:1–14.  Jackson administered Coumadin to Gunter in accordance with the new prescription on November 14 and November 15.  *See* J.A. 606, Deposition of Francessia Robinson Jackson ("Jackson Dep.") 46:19–25.

On November 15, 2012, Jackson prepared transfer paperwork for Gunter which summarized Gunter's condition and listed his treatment/medications.  *See* J.A. 608–10, Jackson Dep. 55:3–13; *see also* J.A. 539.

On November 16, 2012, a Friday afternoon, Gunter was transferred from DCDC to SCDC.  J.A. 627, Deposition of Sandra Hunt ("Hunt Dep.") 27:23–25.  SCDC contracts with SHP for medical services.  J.A. 578–92.  Gunter arrived at the jail after appellee Sandra Hunt, a nurse and the Team Administrator for SHP, had left for the weekend.  J.A. 628, Hunt Dep. 28:1–2.  In accordance with jail policy, a detention officer telephoned Hunt at home to notify her of Gunter's arrival and to answer her questions regarding Gunter's medication.  J.A. 628,

6

Hunt Dep. 28:15–23. Hunt states she was not aware of Maldonado's order for Coumadin as the detention officer did not relay that information to her. J.A. 629, Hunt Dep. 29:14–18. Hunt did not direct the SCDC detention staff to dispense any medication to Gunter, including the medicine Gunter obtained from his family,[2] and absent specific authorization from Hunt, SCDC detention staff were prohibited from dispensing medication to Gunter. *See* J.A. 631, 633, Hunt Dep. 33:10–18, 35:4–10. Gunter did not receive any Coumadin on November 16, November 17, or November 18. *See* J.A. 635, Hunt Dep. 40:13–17.

On November 19, 2012, the following Monday when Hunt returned to work, Hunt arranged for Gunter to receive the requisite Coumadin doses on November 19 and November 20. J.A. 1299, Hunt Dep. 69:14–18. Hunt asserts she never received the transfer paperwork prepared by Jackson. J.A. 629, Hunt Dep. 29:21–23. Nothing in the record suggests Gunter submitted any grievance forms or pursued any administrative remedies against DCDC or SCDC related to their failure to provide him with his required dosages of Coumadin.

On November 21, 2012, Gunter was released from SCDC with only the six Coumadin pills his family initially brought him when he was held at DCDC. Nothing in the record suggests SCDC prepared a medication plan for Gunter or discharged Gunter with a medication plan.

On November 29, 2012, Gunter was admitted to Wake Forest Baptist Medical Center ("Wake Forest") for a blood clot. J.A. 746–47. At the time of his admission, his INR levels were 1.7, well below the therapeutic range. J.A. 749. His medical records from Wake Forest indicated that he began experiencing abdominal pain two days before seeking admission and

---

[2] Nurse Hunt asserts the medicine Gunter received from his family was outdated, and as such, she was not permitted to dispense it to Gunter. *See* J.A. 629, Hunt Dep. 29:11–13.

had been off his Coumadin since earlier that week. J.A. 746–47. Wake Forest surgically removed the blood clot during Gunter's stay, and Gunter was later discharged on December 11, 2012, with a therapeutic INR level of 3.16. J.A. 747. Gunter's INR was subtherapeutic on four of the five INR tests he received between December 14, 2012, and January 2, 2013. On January 18, 2013, Gunter was diagnosed with a second blood clot requiring surgeons to resect part of his bowel.

## II.

### A.

On December 27, 2016, Gunter filed the operative Second Amended Complaint ("SAC") against appellees Davie County, Stokes County, Andy Stokes, Cameron Sloan, Mike Marshall, Eric Cone, Western Surety Company, and Ohio Casualty Company (collectively, "Public Appellees") and Southern Health Partners, Inc. ("SHP"), Jason Junkins, Sandra Hunt, Fran Jackson, and Manuel Maldonado (collectively, "Medical Appellees") alleging that his injuries resulted from the care he received during his detainment at DCDC and SCDC. *See* J.A. 222–63. As relevant here, Gunter alleged Public Appellees and Medical Appellees acted with deliberate indifference toward his constitutional right to adequate medical care. J.A. 252–53; J.A. 257–58. Gunter further alleged a *Monell* claim against Davie and Stokes Counties, as well as a medical malpractice claim against SHP, Jackson, and Maldonado. J.A. 252–62.

On July 6, 2020, Public Appellees filed a motion for summary judgment, arguing, amongst other things, they are entitled to (1) qualified immunity, governmental immunity,

8

and public officer's immunity, and (2) summary judgment with respect to Gunter's Fourteenth Amendment deliberate indifference claim and Gunter's *Monell* claim under 42 U.S.C. § 1983. *See* J.A. 23 (Docket No. 125), 1840–63.

On March 15, 2021, the district court granted Public Appellees' motion for summary judgment and dismissed Gunter's Fourteenth Amendment deliberate indifference claim and Gunter's *Monell* claim under 42 U.S.C. § 1983. Specifically, the district court opined that "[p]retrial detainees alleging they have been subjected to unconstitutional conditions of confinement" must allege (1) "the deprivation alleged was 'objectively, sufficiently, serious'" and (2) the "prison officials acted with deliberate indifference." *See* J.A. 1842–43 (collecting cases) (citations omitted).

The district court found the evidence did not create a "genuine dispute of material fact as to whether a violation of [Gunter's] constitutional rights occurred" for three reasons. J.A. 1842. First, the district court stated even if the first prong was satisfied, Gunter's evidence does not show Public Appellees "were deliberately indifferent to [Gunter's] medical needs." J.A. 1845. Specifically, the district court stated "there is no evidence on the record that Public [Appellees] intended to prevent or delay [Gunter] from receiving medical treatment or that Public [Appellees] ignored his medical needs" and the fact Gunter "disagree[d] with the treatment he received or that a difference course of treatment might have led to a better medical outcome, . . . is not evidence of a subjective intent by Public [Appellees] to deprive [Gunter] of medical treatment, which is necessary to state a constitutional violation." J.A. 1846.

9

Second, the district court stated Gunter "ha[d] not presented evidence that Public [Appellees] had the medical training necessary to make decisions regarding [Gunter's] care . . . and . . . this court does not find that Public [Appellees] should have understood whether [Gunter's] medical care was proper or that it should have been appropriate for Public [Appellees] to intervene in [Gunter's] medical care." J.A. 1848. Seeing no constitutional violations, the district court also disposed of Gunter's *Monell* claim. J.A. 1849. Accordingly, the district court granted Public Appellees' motion for summary judgment as to Gunter's constitutional claims. J.A. 1848–49.

**B.**

Medical Appellees also filed a motion for summary judgment, which the district court granted in part and denied in part on March 23, 2021. J.A. 23 (Docket No. 123); J.A. 31 (Docket No. 178). Gunter and Medical Appellees moved for reconsideration. J.A. 31–32 (Docket Nos. 179, 181–82). On June 10, 2021, the district court granted Medical Appellees' motion for reconsideration; granted in part and denied in part Gunter's motion for reconsideration; and reopened summary judgment. J.A. 32–33 (Docket No. 190).

On September 17, 2021, the district court struck its previous March 23, 2021 Memorandum Opinion and Order stating that "for purposes of maintaining a relatively clear record, . . . one opinion and order addressing all summary judgment arguments and related issues [wa]s appropriate." *Gunter v. S. Health Partners, Inc.*, 2021 WL 4255370, at *1 (M.D.N.C. Sept. 17, 2021). That order only addressed claims and motions related to the case against Medical Appellees. *See id.*

10

As relevant here, Gunter brought medical malpractice claims against SHP, Jackson, and Maldonado. With respect to Gunter's medical malpractice claim against SHP, the district court found "a reasonable jury could not return a verdict in favor of [Gunter] on the evidence presented" because Gunter failed to "present[] evidence through expert testimony that [SHP] violated a standard of care owed to [Gunter]." *Id*. at *17. Specifically, the district court found Gunter's four expert witnesses either (1) declined to opine on whether SHP's protocol breached the standard of care or (2) only offered an opinion on whether Jackson, Hunt, or Maldonado breached the standard of care. *Id.* at *17. Hence, the district court granted summary judgment for SHP on Gunter's medical malpractice claim.

With respect to Gunter's medical malpractice claim against Jackson and Maldonado, the district court found Gunter created a genuine dispute of material fact as to whether both breached the standard of care. *Gunter*, 2021 WL 4255370, at *17–19. However, the district found Gunter failed to show proximate cause. *Id.* at *21–27. First, the district court found Gunter's evidence related to his medication and INR testing prior to his incarceration was inadmissible. *Id.* at *21–22. Specifically, the district court found that Gunter "ha[d] not provided records indicating what his INR levels were prior to his incarceration or records of the prescriptions that this physician wrote for him" and that Gunter cites "his only deposition for this proposition." *Id.* at *21. Second, the district court found other evidence put forth by Gunter related to his medication and INR testing prior to his incarceration was unpersuasive. *See id.* at *21–23. For example, the district court reviewed Gunter's pharmacy records which indicated Gunter received several "emergency" doses of Coumadin without a valid prescription from his doctor, Dr. Yoder, but ultimately determined "[t]he evidence presented

11

by [Gunter] does not reflect [Gunter] was therapeutically medicated when he was first arrested on November 6, 2012, as suggested by Dr. Sease's unrebutted affidavit." *Id.* at *23. Likewise, the district court reviewed a pre-incarceration clinical communication record but ultimately found it did not establish proximate cause because the record did not demonstrate the clinic "specifically communicated to Nurse Jackson that [] Gunter *should* take 7mg of warfarin per day . . . the only mention of Coumadin or Warfarin in the visit summary is that [Gunter] reported taking 7mg of Warfarin Sodium by mouth daily." *Id.* at *22 (emphasis in original). Third, the district court determined, as explained below in Section II.C.1–2, Gunter's experts—Dr. Yoder, a doctor of pharmacy, and Dr. Damian Laber, a physician— failed to testify "with a reasonable degree of medical certainty." *Id.* at *23–26.[3]

## C.

### 1.

Dr. Yoder testified at a deposition that Gunter's missed doses in jail were the proximate cause of his blood clot injuries. J.A. 1559, Yoder Dep. 207:8–19. Dr. Yoder further testified Gunter had been her patient for years and that she assumed Gunter was properly anticoagulated prior to his incarceration. *See* S.J.A. 2515, Yoder Dep. 122:22– 25. Specifically, Dr. Yoder stated, "the thing that I know about [Gunter] is that, regardless of how long it's been since he actually stepped foot in my office, he ha[s] always taken his medication" and "I've never known him to just be off of it just because." J.A. 2518, Yoder

---

[3] In addition, the district court rejected Gunter's deliberate indifference claim against Medical Appellees for essentially the same reasons it rejected his deliberate indifference claim against Public Appellees. *See Gunter*, 2021 WL 4255370 at *31–32.

12

Dep. 125:5–9.  Counsel of Appellees asked Dr. Yoder to assess Gunter's level of contributory negligence, assuming Gunter was not anticoagulated prior to incarceration. The deposition transcript provides, in relevant part:

> **Appellees' Counsel:**  Okay.  So wouldn't the - - assuming that he wasn't compliant with his Coumadin dosages, that he didn't take the correct dosage every single day, that he didn't seek medical care from a physician or from a pharmacist and he did not seek out a Lovenox bridge[4] or anything like that, wouldn't he be at least as equally responsible as the jail for the clot? . . . .
>
> **Dr. Yoder:**  I don't - - I don't think that there's a 50/50 split in blame just based on the number of days in a month.  That's the problem with anticoagulation, is that one day, one week - - I mean, it's all about trends, and unfortunately, I don't - -like you said, we don't have all of the data in - -
>
> **Appellees Counsel:**  Well, what percentage would you be at fault for - - if you're saying - -
>
> **Dr. Yoder:**  I don't know.
>
> **Appellees Counsel:**  - - that the jail not giving him his medicine on these five days is the cause of that clot, what percentage is he at fault for the cause of that clot because of his failures in adhering to - - in being compliant? . . . .
>
> **Dr. Yoder:**  I - - I don't know how to assess that.

S.J.A. 2605–06, Yoder Dep. 212:7–213:14.

Generally, Dr. Yoder relied on several factors in determining proximate cause, including the relationship she had with Gunter and his history of always taking his medication, the number of Coumadin doses Gunter missed, the lack of monitoring Gunter's INR levels, the fact that Gunter was not administered a Lovenox bridge "to protect him

---

[4] A Lovenox bridge is used to create a rapid anticoagulant effect to cover the patient while they are waiting for Coumadin therapy to take full effect.  J.A. 709.

13

against an event happening down the road[,]" the consistency of inconsistent dosing, the timing of the missed doses, and the presentation of symptoms and subsequent admission. J.A. 1559–60, Yoder Dep. 207:22–208:18.

The district court found Dr. Yoder's testimony concluding "missed doses in the jail were the proximate cause" of Gunter's blood clots unpersuasive for three reasons. *Gunter*, 2021 WL 4255370, at *23. First, the district court found Dr. Yoder's testimony "reflect[ed] impermissible speculation that [Gunter] had been properly anticoagulated prior to entering the jail." *Id.* Second, the district court found Dr. Yoder "could not assess the extent to which changing her underlying assumption about [Gunter's] compliance would change her assessment as to whether [Gunter] was liable for his injury" or state a percentage range with respect to Gunter's level of fault. *Id.* at 24. Third, the district court found Dr. Yoder "confus[ed] correlation with causation by drawing a conclusion from a temporal relationship." *Id.* Hence, the district court found Dr. Yoder's testimony unpersuasive.

**2.**

Dr. Laber also testified at a deposition that the lack of anticoagulation for Gunter's cardiac valve was the cause of Gunter's blood clots for which he was hospitalized. S.J.A. 2774, Deposition of Damian A. Laber ("Laber Dep." 116:13–18). Dr. Laber further testified he believed Gunter was anticoagulated before he was incarcerated because "[Gunter] sa[id] so" and "[Gunter] was taking his medication, and he ha[d] this valve replacement when he was a child . . . [s]o he knows this for many, many, many years." S.J.A. 2744, Laber Dep. 86:18–23. When asked by counsel for Appellees if he could "state to a reasonable degree of medical certainty that [Gunter's] blood clot formed weeks before his hospitalization[,]" Dr.

14

Laber responded "I don't think we can tell for sure." S.J.A. 2712, Laber Dep. 54:7–11. In addition, Dr. Laber outlined a range of times in which clot formation was likely, and stated based on the medical record, it could be implied Gunter's blood clot formed days or weeks before Gunter's hospitalization. S.J.A. 2712, Laber Dep. 54:6. Moreover, Dr. Laber noted "throughout the whole incarceration, there [was] not one INR that was therapeutic" and "the risks go exponentially higher for each time [Gunter] remains below the therapeutic range." S.J.A. 2782, Laber Dep. 124:1–11.

In addition, regarding proximate cause and the county jails' failure to provide Gunter with the proper dosage of medication, the deposition transcript reflects the following, in relevant part:

> **Appellees Counsel:** How many days did Mr. Gunter not get Coumadin at the jail?
>
> **Dr. Laber:** The records are not very good - - actually, are fairly poor, okay? There should be a record of administration and all of that. But there is - - I'd estimate that at least more than half of the time, about half of the time.
>
> And then when he was checked for his INR, it was subtherapeutic. He was supposed to get 7.5 milligrams, and he did not. And it took days until he could get the right dose.
>
> So some days were skipped. Some days were underdosed. So - - and that is the responsibility of the jail, because, as you know, when they're in jail, they - - they don't have their own medications. They are stripped from everything.

S.J.A. 2747, Laber Dep. 89:2–18. Generally, Dr. Laber relied on several factors in determining proximate cause, including the "documentation" he reviewed, the evidence of lack of proper care, and the risk posed to Gunter due to his MHV. *See generally* Laber Dep.

15

The district court found Dr. Laber's testimony concluding "the lack of anticoagulation for the [cardiac] valve" was the cause of Gunter's blood clots unpersuasive for three reasons. *Gunter*, 2021 WL 4255370, at *13. First, the district court found Dr. Laber was "unable to state to a reasonable degree of medical certainty when the blood clot that injured [Gunter] formed" and "could not quantify the increase in risk where a patient misses three consecutive days of Coumadin" and therefore, his testimony was "conjecture." *Id.* at *25. Second, the district court found Dr. Laber, "like Dr. Yoder, . . . assumed that [Gunter] was properly anticoagulated upon arrival at the jail and that he took his medication every day upon release from the jail." *Id.* Third, the district court found Dr. Laber "relied on the temporal connection between the blood clot and [Gunter's] incarceration as evidence of proximate cause." *Id.* at *26. Hence, the district court found Dr. Laber's testimony unpersuasive.

**3.**

The district court also ruled on Medical Appellees' motion to strike Dr. Laber's post-declaration deposition. In the post-declaration deposition, Dr. Laber declared, in relevant part:

> The records from the jails demonstrate that [Gunter] was not provided any medication for at least five of the fifteen days of his incarceration and was undermedicated with only a 5mg dose on seven other days of his incarceration . . . . In addition to my education, training and experience as a physician, I specifically base my opinions in this case upon . . . the records indicating that [Gunter] was either underdosed and/or not provided medication for nearly the entirety of his incarceration (twelve of fourteen days between November 7th through November 21, 2012)[.]

J.A. 1924–25, Laber Decl. ¶¶ 5, 7.

16

The district court granted Medical Appellees' motion to strike Dr. Laber's deposition finding, amongst other things, "Dr. Laber's commentary about there being an underdosing of medication [wa]s new testimony that expressly contradict[ed] his findings in his deposition about proximate cause being a lack of anticoagulation generally" and Dr. Laber was "proposing a new proximate cause" theory which is not allowed. *Gunter*, 2021 WL 4255370, at \*12. Additionally, the district court found Gunter "offered no explanation for why this testimony was not offered previously, either in Dr. Laber's report or during his deposition." *Id.* Accordingly, the district court granted Medical Appellees' motion to strike Dr. Laber's deposition.

**D.**

In a separate, previous order, the district court also ruled on Gunter's motion to compel Medical Appellees to produce their expert witness Dr. Julie Sease for deposition, which Gunter filed eleven days after the close of discovery. J.A. 469–71, 1704. The district court denied Gunter's motion to compel, finding it was untimely and not due to "excusable neglect." J.A. 1704. Additionally, the district court stated it had already extended the timeline for discovery on two prior occasions (February 25, 2020 and March 23, 2020) and "[h]ad [Gunter] filed his motion to compel within the designated discovery period, the [c]ourt may have decided differently." *Id.* at 1704–05. Accordingly, the district court denied Gunter's motion to compel.

**III.**

The granting of a summary judgment motion is reviewed de novo. *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). Thus, this Court "uses the same standard as the district

17

court[,]" *id.*, and a moving party is entitled to summary judgment "if there is no genuine dispute as to any material fact," Fed R. Civ. P. 56(c).

Before us on appeal is the district court's dismissal of Gunter's (1) § 1983 claim for deliberate indifference under the Fourteenth Amendment Medical Appellees, (2) § 1983 *Monell* claim against Davie and Stoke Counties, and (3) medical malpractice claims against SHP, Jackson, and Maldonado.  Such dismissals were errors.  We address each error in turn.

## A.

The district court erred in dismissing Gunter's § 1983 claim for deliberate indifference under the Fourteenth Amendment against Medical Appellees.  The district court likewise erred in dismissing Gunter's § 1983 *Monell* claim against Davie and Stoke Counties and medical malpractice claim against SHP.

## 1.

Starting with Gunter's § 1983 claim for deliberate indifference under the Fourteenth Amendment, we find that the district court erred in finding Gunter's evidence did not "create a genuine dispute of material fact" that Medical Appellees "were deliberately indifferent to [Gunter's] medical needs."  J.A. 1845; *Gunter*, 2021 WL 4255370 at *31. Gunter, as a pre-trial detainee, need only show that the challenged government action was "not rationally related to a legitimate nonpunitive purpose or [wa]s excessive in relation to that purpose" to establish deliberate indifference.  *Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 2631 (2024) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015)).  While the district court did not have the benefit of this Court's decision in *Short*, *Short* now governs our analysis here.

18

The record makes clear that Gunter has presented sufficient evidence to proceed beyond the summary judgment stage, and thus remand is unnecessary. Applying the test articulated in *Short*, we first ask whether Gunter had an objectively serious medical condition. *See id.* at 612. Gunter's heart condition qualifies as objectively serious.

The next step requires that the plaintiff show "that the defendant acted or failed to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* at 611 (quoting *Farmer v. Brennan*, 511 U.S. 825, 836-37 (1994)). Gunter need not prove that each defendant had "actual knowledge;" as *Short* clarified, he must show only "that the defendant[s] should have known of that condition and that risk," and acted objectively unreasonably. *Id.* Here, the record indicates that several SHP employees, including Jackson and Maldonado, had actual knowledge of Gunter's condition and medication needs, and that his medical requirements were reflected in Jackson's medical notes and the faxed medical record Jackson received from a clinic. A reasonable jury could therefore find that the available medical information put Medical Appellees on sufficient notice that depriving Gunter of Coumadin would incite acute health issues. That Gunter subsequently experienced blood clots satisfies the final prong of the *Short* test, which requires the plaintiff be harmed by the defendant's action or inaction. *Id.*

As we have frequently explained, "no legitimate nonpunitive goal is served by a denial or unreasonable delay in providing medical treatment where the need for such treatment is apparent." *Id.* at 606 (citing *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988)). Accordingly, the district court erred by dismissing this claim at the summary judgment stage.

19

**2.**

The district court further erred in dismissing Gunter's *Monell* claim against Davie and Stokes Counties pursuant to 42 U.S.C. § 1983. To start, "[l]ocal governing bodies (and local officials sued in their official capacities) can . . . be sued directly under § 1983 for monetary, declaratory, and injunctive relief in those situations where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted or promulgated by those whose edicts or acts may fairly be said to represent official policy." *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 659 (1978).

> A policy or custom for which a municipality may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifests deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting <u>Carter v. Morris</u>, 164 F.3d 215, 218 (4th Cir. 1999). In addition, a plaintiff must show that a municipality's policies were "the moving force behind a deprivation of federal rights." *Washington v. Housing Auth. of Columbia*, 58 F.4th 170, 182 (4th Cir. 2023) (quotation omitted).

Gunter has brought a *Monell* claim against Davie and Stokes Counties, arguing that they contracted out their authority and obligation to provide adequate medical care to inmates at their jails to SHP, whose decisions, a reasonable jury could find, resulted in his injuries. *See* Appellant's Opening Br. at 40–42. We agree.

"The Count[ies]' express policies as embodied in the[ir] contract[s] [with SHP] show that the Count[ies] delegated to . . . [SHP] final authority to make decisions about inmates' medical care." *King*, 680 F.3d at 1021; J.A. 566–77 (Davie County contracting with SHP "to provide for the delivery of all medical and dental services to inmates" at DCDC); J.A. 578–92 (Stokes County contracting with SHP "to provide for the delivery of all medical, dental and mental health services to inmates" at SCDC).  As such, they may be held responsible for SHP's "decisions." *See Lytle*, 326 F.3d at 471; *see also King*, 680 F.3d at 1021; *Hunter v. Town of Mocksville, N. Carolina*, 897 F.3d 538, 554 (4th Cir. 2018) ("[A] 'governmental unit may create an official policy by making *a single decision* regarding a course of action in response to particular circumstances' so long as that governmental unit possessed 'final authority to create official policy.'" (quoting *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999))); *West v. Atkins*, 487 U.S. 42, 56 (1988) ("Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their [] rights.").  Drawing all inferences in Gunter's favor, we find that a genuine dispute of material fact exists as to whether SHP's decisions were the moving force behind Gunter not receiving adequate medical care and suffering serious injuries.

Evidence in the record suggests that SHP had a custom and practice of taking days to get inmates their medication, and of not having a medical professional available to treat inmates during weekends.  *See* J.A. 634–35, 1295–97.  A reasonable jury could find that these decisions were "the 'moving force'" behind Gunter not receiving adequate medical care and suffering serious injuries.  *Washington*, 58 F.4th at 182.

21

Despite Gunter arriving to DCDC on November 7, 2012, and receiving Coumadin pills from his family on November 8, 2012, Gunter was unable to take Coumadin until November 9, 2012, and he did not receive an INR test until November 13, 2012. J.A. 605, Hunt Dep. 45:19–22; J.A. 540, Maldonado Dep. 1303–04, 1306. SHP also failed to make a nurse available for initial medical screening on the Friday afternoon Gunter arrived at SCDC, *see* J.A 634–35, 1287–93, Hunt Dep., and such failure resulted in Gunter going three days without adequate medical care, namely Coumadin and INR level testing. *See id.* A reasonable jury could therefore find that SHP's decisions resulted in Gunter being "off prescribed medications without appropriate oversight."[5] *King*, 680 F.3d at 1021. Accordingly, we vacate and remand Gunter's *Monell* claim for further proceedings.

### 3.

The district court similarly erred when it dismissed Gunter's medical malpractice claim against SHP. To prevail on a medical malpractice claim, a plaintiff must show "(1) the applicable standard of care; (2) a breach of such standard of care; (3) the injuries suffered by the plaintiff were proximately caused by such breach; and (4) the damages resulting to the plaintiff." *Weatherford v. Glassman*, 129 N.C. App. 618, 621 (1998). In addition, an employer may be liable under a respondeat superior theory if the employee's

---

[5] While evidence indicates that SHP could have obtained same-day medication via emergency orders at local pharmacies, J.A. 634–35, 1296–97, it also shows that this was not standard procedure, J.A. 631, 634–35. And in any event, because no medical professional was available to place an emergency order none was ever placed—despite jail staff being aware that Gunter had a prescription for Coumadin. J.A. 634–35, 1297. Thus, as in *King v. Kramer*, 680 F.3d 1013 (7th Cir. 2012), a reasonable jury could conclude that SHP's decisions working together resulted in Gunter's deprivation of adequate care. *See id.* at 1021.

22

act is "expressly authorized" and "committed within the scope of the employee's employment" and in furtherance of the employer's business. *Medlin v. Bass*, 327 N.C. 587, 592 (1990) (internal brackets omitted). "Where the employee's actions conceivably are within the scope of employment and in furtherance of the employer's business, the question is one for the jury." *Id.* at 593.

As an initial matter, my colleague in concurrence finds that Gunter's medical malpractice claim premised upon respondeat superior against SHP is waived because "[s]uch a claim was not in Gunter's Second Amended Complaint[.]". *See* Richardson, J., concurring and dissenting at 44 n.5. But not so. Gunter explicitly alleged a medical malpractice claim against SHP in his Second Amendment Complaint. *See* J.A. 260–62. Gunter alleged that SHP "is authorized to transact business within the State of North Carolina" and specifically, has contracted with Public Appellees to provide medical services at county jails. J.A. 224. Gunter further alleged that SHP operates pursuant to the contract and it committed actions within the scope of the contract—namely, providing substandard medical care—in furtherance of its contract to support county jails. *See* J.A. 240, 257. Hence, Gunter's medical malpractice claim is not waived.

Moreover, North Carolina courts agree that it is within a county's purview to provide adequate medical care for incarcerated persons. *See Medley v. N.C. Dep't of Corr.*, 330 N.C. 837, 841 (1992); *State v. Wilson*, 183 N.C. App. 100, 103 (2008). In addition, providing medical care to those incarcerated in county jails is a nondelegable duty of the county, and thus, any independent contractor hired to perform that duty is an agent of the state as a matter of law. *See Medley*, 330 N.C. at 844–45. Here, Public Appellees have a

23

nondelegable duty to provide medical care to those incarcerated in DCDC and SCDC, and Public Appellees hired SHP as an independent contractor to perform that duty. Hence, SHP is an agent of the state as a matter of law. *See Medley*, 330 N.C. at 841; *Wilson*, 183 N.C. App. at 103. Therefore, Gunter has a medical malpractice claim against SHP. Accordingly, the district court erred in dismissing Gunter's medical malpractice claim against SHP.

**B.**

We now turn to Gunter's medical malpractice claim against Jackson and Maldonado. As mentioned previously, to prevail on a medical malpractice claim, a plaintiff must show "(1) the applicable standard of care; (2) a breach of such standard of care; (3) the injuries suffered by the plaintiff were proximately caused by such breach; and (4) the damages resulting to the plaintiff." *Weatherford*, 129 N.C. App. at 621.

The parties only dispute the third element. As relevant here, Gunter put forth the following pieces of evidence to demonstrate proximate causation: evidence related to Gunter's access to medication prior to incarceration, the testimony of Dr. Yoder, and the testimony of Dr. Laber.

The district court found these pieces of evidence put forth by Gunter were inadmissible and ultimately concluded that Gunter failed to present a genuine dispute of material fact as to whether his medical treatment in jail proximately caused his blood clots.

We review the district court's evidentiary rulings for abuse of discretion. *United States v. Johnson*, 617 F.3d 286, 292 (4th Cir. 2010). In addition, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences

24

from the facts are jury functions" and are not permitted by a district judge while ruling on a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (stating "[t]he court . . . cannot weigh the evidence or make credibility determinations." (quoting *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568–69 (4th Cir. 2015))).

We find that the district court abused its discretion by excluding Gunter's evidence related to his access to medication prior to incarceration, the testimony of Dr. Yoder, and the testimony of Dr. Laber. We address each error in turn.

**1.**

First, the district court improperly weighed evidence regarding Gunter's access to medication prior to incarceration. With respect to Gunter's pharmacy records which indicated Gunter received several "emergency" doses of Coumadin without a valid prescription from Dr. Yoder, the district court stated "[t]he evidence presented by [Gunter] does not reflect [Gunter] was therapeutically medicated when he was first arrested on November 6, 2012, as suggested by Dr. Sease's unrebutted affidavit." *Gunter*, 2021 WL 4255370 at *23. Here, the blatant weighing of the evidence is simple: the district court weighed the evidence of the parties and found Medical Appellees' expert witness, Dr. Sease, who suggested Gunter was not therapeutically medicated prior to incarceration, was more credible than the evidence put forth by Gunter. Such weighing of the evidence is error.

Second, the district court improperly resolved evidence related to Gunter's access to medication prior to incarceration. Specifically, the district court found a medical record faxed to Jackson failed to establish proximate cause. The district court stated the medical

25

record did not demonstrate the clinic "specifically communicated to Nurse Jackson that []

Gunter *should* take 7mg of warfarin per day, . . . the only mention of Coumadin or Warfarin

in the visit summary is that [Gunter] reported taking 7mg of Warfarin Sodium by mouth

daily." *Gunter*, 2021 WL 4255370 at \*22 (emphasis in original).  While the district court

is correct that the faxed communication does not establish Gunter's prescribed dosage or

serve to prove the clinic specifically communicated to Jackson about his daily dosage, the

district court is incorrect in assuming this faxed medical record does not create a genuine

dispute about proximate cause generally.  For example, the medical record stated Gunter

reported to the clinic that he took 7mg of Coumadin daily.  Additionally, Jackson received

this fax on November 8, 2012, the same day Jackson contacted Gunter's primary care

physician and pharmacist about his condition.  *See* J.A. 533.  Therefore, drawing all

inferences in favor of Gunter, a dispute of material fact remains whether Jackson was on

notice that 7mg of Coumadin was a common daily dose for Gunter.  This is significant

because if Jackson was on notice, she could have communicated this with Maldonado, who

she consulted with on the same day that she received the fax, and who subsequently ordered

a prescription for 5mg of Coumadin for Gunter.  *See* J.A. 1303, Maldonado Dep. 83:20–

25.  If Jackson chose to ignore the fax[6] and not tell Maldonado, which subsequently led to

Gunter not receiving the proper doses of Coumadin and subsequently sustaining an injury,

---

[6] Gunter asserts this fax communication was not originally produced by Appellees, and only discovered by Gunter after the close of discovery.  *See* Gunter's Corrected Opening Br. at 35.  As such, counsel for Gunter was not able to question Jackson about this document during her deposition.  *Id.*  Appellees' do not mention or otherwise dispute this fact.  *See* Appellee's Response Br.

Gunter could use this medical record as a way to show proximate cause with respect to Jackson. Accordingly, in light of the fact more than one inference could be drawn as to the proximate cause of Gunter's injury, the district court erred in resolving evidence at the summary judgment stage. *See Olds v. United States*, 473 F. App'x 183, 185 (4th Cir. 2012). Hence, the district court erred in determining the fax communication to Jackson did not establish proximate cause.

Accordingly, the district court improperly weighed or resolved evidence related to Gunter's access to medication prior to his incarceration. Such evidence should not have been excluded, and it was an abuse of discretion for the district court to conclude otherwise.

**2.**

The district court abused its discretion in finding Dr. Yoder failed to testify with a reasonable degree of medical certainty. To begin, the district court stated Dr. Yoder's testimony (1) "reflect[ed] impermissible speculation that [Gunter] had been properly anticoagulated prior to entering the jail"; (2) "could not assess the extent to which changing her underlying assumption about [Gunter's] compliance would change her assessment as to whether [Gunter] was liable for his injury" or give a percentage range with respect to fault when asked to do so by Appellee's counsel; and (3) only drew conclusions "from a temporal relationship." *Id.* at 23–24. But such findings are incorrect.

With respect to the district court's first finding, the district court improperly stated Dr. Yoder's testimony was speculation. Dr. Yoder's testimony that she assumed Gunter was properly anticoagulated before he was incarcerated is not based on speculation. This is because Gunter had been Dr. Yoder's patient for years and as such, Dr. Yoder was qualified

27

to opine on Gunter's habits and compliance with Coumadin therapy based on her relationship with Gunter in her professional capacity. *See* S.J.A. 2515, Yoder Dep. 122:22–25. Specifically, Dr. Yoder testified, "the thing that I know about [Gunter] is that, regardless of how long it's been since he actually stepped foot in my office, he ha[s] always taken his medication" and "I've never known him to just be off of it just because." S.J.A. 2518, Yoder Dep. 125:5–10. Such testimony by Dr. Yoder is not speculation because it is grounded in her professional opinion based on what she has known about Gunter for years. *See id.*; *see also* Fed. R. Evid. 703, Advisory Comm. Note ("[A] physician in his own practice bases his diagnosis on information from numerous sources and of considerable variety, including statements by patients and relatives . . . . [Such] validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes.").

Additionally, it is unclear whether Dr. Yoder assumed Gunter was compliant with taking his medication or was told in her deposition to assume Gunter was compliant. *See* S.J.A. 2604–06, 2759. But even assuming Dr. Yoder based her finding on an assumption, the district court improperly discredited her testimony. Even if Gunter was not properly anticoagulated when he entered the jail, evidence of the lack of care Gunter received while in jail creates a dispute of material fact as to whether his injuries were proximately caused by Jackson's and Maldonado's failure to provide said care.

With respect to the district court's second finding, the district court made an improper credibility determination regarding Dr. Yoder's testimony in which she stated that she did not know "how to assess" a numerical percentage in which Gunter was at fault for his injuries. *Gunter*, 2021 WL 4255370 at *24. While Dr. Yoder was unable to provide

28

a percentage in which Gunter was at fault for his injuries, she did nonetheless state there was not a "50/50 split in blame" and "[t]hat's the problem with anticoagulation, is that one day, one week . . . it's all about trends[.]" S.J.A. 2605–06, Yoder Dep. 212–13. Dr. Yoder need not articulate a specific numerical percentage to assert an opinion with a reasonable degree of medical certainty. In addition, determining one's percentage of fault is a legal conclusion, and the district court erred in using Dr. Yoder's answer as a basis for judging her credibility.

With respect to the district court's third finding, the district court was incorrect in finding Dr. Yoder only drew her conclusions from a "temporal relationship." In fact, Dr. Yoder relied on several factors in determining proximate cause, including the (1) relationship she had with Gunter and his history of always taking his medication, (2) number of Coumadin doses Gunter missed, (3) lack of monitoring Gunter's INR levels, (4) fact that Gunter was not administered a Lovenox bridge "to protect him against an event happening down the road[,]" (5) "consistency of inconsistent dosing," (6) timing of the missed doses, and (7) presentation of symptoms and subsequent admission. J.A. 1559–60.

In summary, Dr. Yoder testified with a reasonable degree of medical certainty, and it was an abuse of discretion for the district court to conclude otherwise.

**3.**

The district court likewise abused its discretion in finding Dr. Laber failed to testify with a reasonable degree of medical certainty. To begin, the district court stated Dr. Laber (1) was "unable to state to a reasonable degree of medical certainty when the blood clot that injured [Gunter] formed" and "could not quantify the increase in risk where a patient misses

29

three consecutive days of Coumadin" and therefore, his testimony was "conjecture"; (2) "like Dr. Yoder, . . . assumed that [Gunter] was properly anticoagulated upon arrival at the jail and that he took his medication every day upon release from the jail"; and (3) "relied on the temporal connection between the blood clot and [Gunter's] incarceration as evidence of proximate cause." *Id.* at 25–26.  But such findings are incorrect.

With respect to the district court's first finding, the district court made an improper credibility determination with respect to Dr. Laber's assessment of clot formation.  While Dr. Laber did not opine as to a specific moment when blood clotting occurred, Dr. Laber outlined a range of times in which clot formation was likely.  Specifically, Dr. Laber testified the blood clot formed days or weeks before Gunter's hospitalization on November 29, 2012, and that based on "the medical record, we can imply" the blood clot formed more than two days before hospitalization.  S.J.A. 2712–13, Laber Dep.  Dr. Laber went on to explain the gradual process of clot formation and the accumulation of damage that occurs over time.  *Id.*  Such testimony is not "conjecture" as Dr. Laber was not required to fully explain with certainty the specific moment when blood clotting occurred; rather, he was permitted to express his conclusions in terms of reasonable probabilities, based on his expertise applied to the facts available to him.  *DaSilva v. Am. Brands, Inc.*, 845 F.2d 356, 361 (1st Cir. 1988).  Moreover, regarding risk quantification, the district court is incorrect that Dr. Laber did not quantify the risk associated with missed doses of Coumadin.  Specifically, Dr. Laber testified "the risks go exponentially higher for each time [Gunter] remains below the therapeutic range" and "throughout the whole incarceration, there is not one INR that was therapeutic."  S.J.A. 2782, Laber Dep. 124:1–11.  Whether Dr. Laber

30

might have done a better job explaining risk quantification is not the test, and such credibility determination is best reserved for a jury. *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 809 (3d Cir. 1997), *as amended* (Dec. 12, 1997). In addition, whether Dr. Laber might have done a better job at explaining risk quantification goes to the weight of the evidence, which is also best reserved for a jury.

With respect to the district court's second assertion, the district court improperly determined that Dr. Laber's testimony was speculation. Dr. Laber's testimony that he assumed Gunter was properly anticoagulated before he was incarcerated is not based on speculation, as Dr. Laber was familiar with Gunter's medical history and as such, was qualified to opine on Gunter's habits and compliance with Coumadin therapy. Specifically, Dr. Laber testified that he believed Gunter was anticoagulated before he was incarcerated because "[Gunter] sa[id] so" and "[Gunter] was taking his medication, and he ha[d] this valve replacement when he was a child . . . [s]o he knows this for many, many, many years." S.J.A. 2744, Laber Dep. 86:18–23. Such testimony by Dr. Laber is not speculation because it is grounded in his professional opinion based on what he knows about Gunter's medical history and the risks of not taking Coumadin consistently. *See id*. In addition, it was permissible for Dr. Laber to rely on patient history to make a finding. Patient history comes from the patient, and it is not unusual for a doctor to make findings and recommendations based on a patient's history to draw conclusions. *See* Fed. R. Evid. 703, Advisory Comm. Note ("[A] physician in his own practice bases his diagnosis on information from numerous sources and of considerable variety, including statements by patients and relatives . . . . [Such] validation,

31

expertly performed and subject to cross-examination, ought to suffice for judicial purposes.").

As with Dr. Yoder's testimony, it is unclear whether Dr. Laber assumed Gunter was compliant with taking his medication or was told in his deposition to assume Gunter was compliant. *See* S.J.A. 2604–06, 2759. But as we stated above, the district court improperly discredited his testimony regardless. Even if Gunter was not properly anticoagulated when he entered the jail, evidence of the lack of care Gunter received while in jail creates a dispute of material fact as to whether his injuries were proximately caused by Jackson's and Maldonado's failure to provide said care.

With respect to the district court's third finding, the district court was incorrect in finding Dr. Laber "relied on the temporal connection between the blood clot and [Gunter's] incarceration as evidence of proximate cause." *Gunter*, 2021 WL 4255370 at \*26. In fact, Dr. Laber relied on several factors in determining proximate cause, such as (1) documentation he reviewed, (2) the evidence of lack of proper care, and (3) the risk posed to Gunter due to his MHV. *See* Laber Dep.

In summary, Dr. Laber testified with a reasonable degree of medical certainty, and it was an abuse of discretion for the district court to conclude otherwise.

## C.

We now turn to the district court's grant of Medical Appellees' motion to strike and the district court's denial of Gunter's motion to compel, which we review for abuse of discretion. *United States v. Ancient Coin Collectors Guild*, 899 F.3d 295, 324 (4th Cir. 2018).

32

**1.**

Here, the district court abused its discretion in striking Dr. Laber's post-deposition declaration. While the district court found that "Dr. Laber's commentary about there being an underdosing of medication [wa]s new testimony that expressly contradict[ed] his findings about proximate cause being a lack of anticoagulation generally[,]" *Gunter*, 2021 WL 4255370, at *12, this is incorrect. Dr. Laber explicitly mentions "underdosing" as a proximate cause theory in his deposition which is consistent with his mentioning of "underdosing" in his post-deposition declaration. S.J.A. 2747, Laber Dep. 89:1–18 ("[I]t took days until [Gunter] could get the right dose. So some days were skipped. Some days were underdosed."); J.A. 1925–26, Laber Decl. ("I specifically base my opinions in this case upon . . . the records indicating that [Gunter] was either underdosed and/or not provided medication for nearly the entirety of his incarceration."); *see Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 n.7, 189 n.13 (4th Cir. 2001) (explaining that the rule against contradictory affidavits only applies to "bona-fide inconsistenc[ies]" that are "clear-cut" without any "ambiguity"). In light of the fact that Dr. Laber's declaration did not put forth a new theory of proximate cause or expressly contradict his earlier testimony, it should have been admitted, and it was an abuse of discretion for the district court to conclude otherwise.

**2.**

The district court did not abuse its discretion when it denied Gunter's motion to compel Medical Appellees to produce their expert witness, Dr. Julie Sease, for deposition. The district court had previously extended the timeline for discovery on two prior occasions. *See* J.A. 1704. Additionally, Gunter filed his motion eleven days after the

33

discovery deadline, and the district court found such timeliness was not due to "excusable neglect." *Id.* Accordingly, in light of these facts, the district court did not abuse its discretion when it denied Gunter's motion to compel. *See Spencer Med. Assocs. v. Comm'r*, 155 F.3d 268, 273 (4th Cir. 1998) ("the mere untimeliness of [a] motion supports the court's denial.").

## IV.

For the foregoing reasons, we reverse the judgment below with respect to Gunter's (1) § 1983 claim for deliberate indifference under the Fourteenth Amendment against Medical Appellees, (2) § 1983 *Monell* claim against Davie and Stoke Counties and (3) his medical malpractice claims against SHP, Jackson and Maldonado, and remand for further proceedings. In addition, we reverse the district court's ruling granting Appellees' motion to strike and affirm the district court's ruling denying Gunter's motion to compel.

*AFFIRMED IN PART, REVERSED IN PART AND REMANDED*

RICHARDSON, Circuit Judge, concurring in the judgment in part and dissenting in part:

David Gunter had a mechanical heart valve put in back in 1990, when he was 15 years old. He has since been on a daily regimen of Coumadin, a blood thinner that prevents blood from clotting on the surface of the valve. Gunter suffered no clotting issues for 22 years. But for the two weeks between November 6 and November 21, 2012, Gunter was held as a pretrial detainee in three different North Carolina county jails, disrupting his daily regimen. Eight days after his release from jail, Gunter checked into the hospital. Doctors found a blood clot in his intestines that required surgical removal. Further intestinal blood clots were found months later.

Gunter blames his blood clots on the poor medical care he received in jail. He brought a litany of claims against the various parties who were involved in some way with his jail stint, including his medical providers and a slew of government entities. The district court granted summary judgment for all defendants below. But some of Gunter's claims were considered under an outdated legal standard. Other claims present factual questions best resolved by a jury. In these respects, I agree with the majority's conclusions. But we part ways on other claims, and I disagree with a few lines of reasoning. So I respectfully concur in the judgment in part and dissent in part.

## I.     BACKGROUND

### A.     Gunter's Medical History

Plaintiff David Gunter had a mechanical heart valve implanted when he was 15 years old. Patients with mechanical heart valves face a higher risk of blood clots, so they are treated with a daily dose of Coumadin (a brand of warfarin), a prescription blood

35

thinner. Too much blood thinner, however, and the patient runs the risk of bleeding out. The goal of Coumadin treatment is to maintain the patient's International Normalized Ratio ("INR") level, which indicates the propensity of a patient's blood to clot, at a therapeutic range, defined as between 2.5 and 3.5 INR.[1] A patient with a mechanical heart valve risks dying from a blood clot when his INR remains below the therapeutic range—reflecting a higher propensity to clot—for too long.

Gunter saw Dr. Virginia Yoder at the Pharmacy Care Clinic—nicknamed the "Coumadin Clinic"—for regular appointments between 2010 and May 2012. A patient with a mechanical heart valve usually gets his INR checked roughly once a month, though the frequency depends on the general stability of his INR and his medical history. Coumadin patients need checkups even when a patient's medication regimen remains unchanged because INR is sensitive to other factors, like diet and alcohol use. At his last two checkups on the record, Gunter had an INR of 2.7 on April 16, 2012, and an INR of 4.2 on May 17, 2012.

On May 31, 2012, Dr. Yoder discharged Gunter as a patient for no-showing too many appointments. Before she discharged him, however, she wrote him a three-month prescription for 6 mg per day of Coumadin. Between May 31 and November 6, 2012, Gunter had no primary-care physician and received no INR testing. But he filled his

---

[1] It is not necessary to know precisely how INR is calculated. In short, the number is derived from a ratio to a standardized "normal" amount of time it takes for blood to clot, called the prothrombin time. A normal INR for an unmedicated individual is around 1.0, representing, roughly, 1.0x the standard prothrombin time. An INR of 2.5 means the blood clots, roughly, 2.5x slower. The higher the number, the slower the blood clots, and vice versa.

prescription from Dr. Yoder each month at his local Walgreens in June, July, and August. He also received several "emergency doses" of Coumadin from the same Walgreens in September, October, and November when he didn't have a prescription.[2] Gunter claimed that between 2010 and 2012, he also received a supply of Coumadin and sporadic INR testing from a neighbor, Dr. Oakowski, who worked at a local clinic.

### B.      Arrest, Jailtime, and Blood Clots

The key events underlying this case began when Gunter was arrested in Forsyth County, North Carolina on November 6, 2012.[3]  At his intake at Forsyth County jail, he reported that he took 6 mg of Coumadin daily.  After one night in Forsyth County jail, he was transferred to the Davie County jail on November 7, 2012.  He was medically screened upon his arrival at Davie County jail by Fran Jackson, a nurse and employee of Southern Health Partners, the contracted medical-care provider for the jail.  Gunter told Nurse Jackson that he had a mechanical heart valve and took Coumadin for it, which she noted in his medical record.  Gunter, however, asked Jackson not to contact his medical care provider since he thought he would be released later that day.

But Gunter was not released that day.  So the next day, November 8, Jackson contacted Gunter's primary-care physician at Maplewood Clinic and his Walgreens pharmacy to verify his medications and conditions.  Maplewood Clinic reported that they

---

[2] Because Coumadin is a common, non-abusable drug that some patients need to survive, pharmacies may dispense Coumadin for free, without a prescription, on an emergency basis at the pharmacy's discretion.

[3] Gunter was arrested pursuant to a bench warrant for his failure to appear in court for a charge of Driving While License Is Revoked.

had last seen Gunter a few months prior, in June 2012, for an unrelated illness but had not managed his INR levels since 2010. A fax from Maplewood Clinic to Jackson shows that at the June visit, Gunter had self-reported that he took 7 mg of Coumadin daily. For unknown reasons, however, Gunter did not provide contact information for Dr. Yoder, who had actively managed his Coumadin therapy between 2010 and 2012.

Despite lacking a full medical history, Jackson spoke about Gunter's Coumadin situation with Manuel Maldonado, a physician's assistant and Southern Health employee who oversaw medical care at the Davie jail. On the 8th, Maldonado prescribed 5 mg of Coumadin for five days starting the next day, running from November 9 to November 13, and ordered an INR test for November 13. He did not perform an INR test before writing the prescription to determine whether such a dose was appropriate. Gunter also contacted his family to get Coumadin, who brought him two 5 mg pills and four 1 mg pills. But he was not permitted to take these pills because they had expired and jail policy did not allow dispensing expired medication.

Gunter thus missed his Coumadin doses on November 7 and 8. He then received 5 mg of Coumadin on November 9, 10, 11, 12, and 13 on Maldonado's prescription. On November 13, 2012, Gunter underwent his first INR test since entering jail, which showed that his INR levels were at 1.07—subtherapeutic. Maldonado responded by ordering an increase of Gunter's Coumadin dosage to 7.5 mg per day, but only on the alternating days of November 15, 17, and 19, keeping his original dose of 5 mg per day for November 14, 16, and 18.

38

On November 16, 2012, Gunter was transferred from Davie County jail to Stokes County jail. The medical care at Stokes County Jail is also run by Southern Health and overseen by Maldonado. Before Gunter left, Jackson completed a transfer form, summarizing his medical condition and medical plan, though she erroneously recorded his November 13 INR as 1.7, not 1.07.

By the time Gunter arrived at Stokes County jail on Friday evening, Sandra Hunt, the Southern Health nurse responsible for Stokes County jail, had already left for the weekend. Following jail policy, an officer at Stokes County jail called Nurse Hunt to inform her of Gunter's arrival and his medical conditions. The officer also told her that Gunter had arrived with a bottle of Coumadin. That bottle appears to have been the expired Coumadin from Gunter's family, so Hunt directed the officer not to dispense it. Hunt was unable to get Coumadin over the weekend. So she did not direct the Stokes County jail officers to dispense any medication to Gunter. And without medical authorization, they could not do so of their own accord. Gunter thus did not take Coumadin on November 16, 17, or 18.

When Hunt returned on Monday, November 19, she dispensed 7.5 mg of Coumadin to Gunter according to Maldonado's alternating schedule. Gunter filed a grievance form that same day, stating, "I have heart trouble, I'm on warfarin and [I'd] like to move to A8 for the bottom bunk." Hunt dispensed another 5 mg of Coumadin the next day, November 20. Gunter was finally released from Stokes County jail on November 21. He still had all six pills (two 5 mg and four 1 mg) of expired Coumadin that his family brought him on November 8 when he was in Davie County jail.

39

Thursday, November 22, was Thanksgiving Day. A few days later, Gunter developed severe abdominal pain, fever, nausea, vomiting, and diarrhea. He was admitted to Wake Forest Baptist Medical Center on November 29. At the time of his admission, his INR level was 1.7 and he stated that he was "off his Coumadin since earlier [in the] week." A CT scan revealed a blood clot in his abdomen, and Gunter underwent surgery to remove the clot the next day.

Gunter was released from the hospital over a week later on December 11, 2012. His INR was then tested five times, on December 14, 17, 20, 27, and January 2, with INRs of 1.6, 1.5, 2.0, 2.7, and 1.9, respectively—only one of five being within therapeutic range. However, despite the low INR, Gunter reported missing no Coumadin dosages between his discharge from the hospital on December 11 and his checkup on January 2. Unfortunately, Gunter fell ill again and was diagnosed with a second blood clot on January 18, 2013, which required a second surgery to resect portions of Gunter's bowel.

## C.    Lawsuit

Gunter filed suit in state court in November 2015. He alleged that two sets of defendants caused his abdominal blood clots: the "Medical Defendants" and the "Public Defendants."

The "Medical Defendants" are composed of: Southern Health Partners, the company that Davie and Stokes County hired to run medical services in their jails and which employs the rest of the medical defendants; Dr. Jason Junkins, the corporate medical director; Nurse Fran Jackson; Physician's Assistant Manuel Maldonado; and Nurse Sandra Hunt.

40

The "Public Defendants" are composed of:  Davie County, where Davie County jail is; Stokes County, where Stokes County jail is; a slew of government employees, including Andy Stokes, Cameron Sloan, Mike Marshall, Eric Cone; and two insurance companies, the Western Surety Company and the Ohio Casualty Company.

The Defendants removed the case to federal court in April 2016.  After various amendments to the complaint, Gunter eventually brought claims against the Medical Defendants for medical malpractice, violations of 42 U.S.C. § 1983, negligence, negligent supervision, false imprisonment, and intentional infliction of emotional distress, and against the Public Defendants for much the same, but with the medical-malpractice and negligence claims swapped for claims alleging violations of North Carolina state law and the North Carolina Constitution.

The federal district court first addressed the claims against the Public Defendants. As to the § 1983 claim, the district court held that pretrial detainees like Gunter—*i.e.*, individuals who have been arrested but not convicted—had to show that prison officials "knew of and disregarded an excessive risk to inmate health or safety." *Gunter v. S. Health Partners, Inc.*, 2021 WL 965035, at *7 (M.D.N.C. Mar. 15, 2021) (quoting *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016)).  But the district court found that Gunter proffered no evidence that would make such a showing about the prison officials' mental states.  As to the various state-law claims, the district court first recognized that Gunter had already conceded that there was insufficient support for any false-imprisonment or emotional-distress claim.  Then, for the negligent-supervision and state-statutory claims, the district court held that no facts supported such claims.  Finally, the district court held

41

that Gunter failed to sufficiently specify a claim under the North Carolina Constitution. With all claims addressed, the district court granted summary judgment to the Public Defendants across the board.

The Medical Defendants walked a longer path whose twists and turns are unnecessary to recount. Important for this case is the evidentiary dispute below between the parties. Gunter produced deposition testimony, affidavits, and declarations from several medical-expert witnesses to support his allegation that his lack of Coumadin treatment in prison caused his blood clots. The Defendants, in turn, moved to strike much of the material from consideration while alternatively arguing that even if admitted, the evidence did not support his claims. The district court ultimately sided largely with the Defendants in excluding the evidence.

Specifically, the district court made three evidentiary decisions central to this appeal. First, the district court excluded deposition testimony from Dr. Yoder because it found that her testimony was neither grounded in a justifiable factual basis nor possessed a reasonable degree of medical certainty. Second, the district court found that deposition testimony by another doctor, Dr. Damian Laber, suffered from the same two defects. Third, and finally, the district court struck a later-submitted declaration from Dr. Laber for "expressly contradict[ing]" his prior deposition testimony. *Gunter v. S. Health Partners, Inc.*, 2021 WL 4255370, at *12 (M.D. N.C. Sept. 17, 2021). Without competing evidence generating a genuine dispute of material fact, the district court granted summary judgment to the Medical Defendants on all claims.

42

Having granted summary judgment on all claims to all defendants, the district court dismissed the case. Gunter timely appealed.

## II.     DISCUSSION

On appeal, Gunter focuses on only two of his many claims, abandoning the rest.[4] First, he appeals the grant of summary judgment on his § 1983 claims against the Medical Defendants and Davie and Stokes Counties. Gunter claims that Medical Defendants Jackson and Maldonado were deliberately indifferent to his medical needs in failing to provide adequate paperwork and Coumadin during his transfer between Davie and Stokes County jail. He further claims that those actions indicate the existence of harmful Davie and Stokes County policies, making the Counties directly liable under § 1983 per *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). I agree that the district court's grant of summary judgment on the § 1983 claim against Jackson and Maldonado cannot stand in light of our intervening decision in *Short v. Hartman*, 87 F.4th 593 (4th Cir. 2023). Unlike the Majority, however, I would follow our direction in *Short* to send the case back to allow the district court to apply the correct standard in the

---

[4] In his opening brief, Gunter does not present the other tort and state-law claims he raised below against the Defendants. He also does not raise his § 1983 claims against any of the individual public defendants. As a result, he has abandoned those claims on appeal. *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief or by failing to develop its argument." (cleaned up)). Though Gunter cites North Carolina state law in his brief, he does so solely in the context of explaining his § 1983 argument and not as part of a distinct state-law claim. Similarly, he only mentions individual public defendants by name in the "Parties" section of his opening brief, then never again. His briefs do not allege any specific action or inaction by individual public defendants that caused him harm.

first instance. I also disagree with the Majority on the § 1983 *Monell* claim against Davie and Stokes Counties and would affirm the district court's rejection of that claim.

Second, Gunter appeals the grant of summary judgment on his medical-malpractice claim just as to Jackson and Maldonado. Gunter argues that summary judgment was erroneous because the district court abused its discretion by excluding the evidence from Dr. Yoder and Dr. Laber that would have, if considered, created a genuine dispute of material fact as to the proximate cause of his blood clots.[5] I agree that we should reverse the district court's grant of summary judgment on the medical-malpractice claims against Jackson and Maldonado on account of Dr. Yoder and Dr. Laber's testimony, which should have been admitted as evidence. But I disagree with the Majority's explanation of why the district court erred. I also disagree with the decision to allow Gunter to raise a *respondeat*

---

[5] Gunter nominally challenges the grant of summary judgment on his medical-malpractice claim to *all* Medical Defendants, including Southern Health, Nurse Hunt, and Dr. Junkins. But on appeal, Gunter only takes issue with the district court's ruling on proximate cause. And Gunter's failure to show proximate cause was the basis for granting summary judgment only to Nurse Jackson and Maldonado. The district court granted summary judgment to the other Medical Defendants on different basis—because it concluded that Gunter had failed to plead facts showing any of them breached the proper standard of medical care. Gunter has not challenged this other basis.

Gunter has also made the novel argument that Southern Health can be found liable for medical malpractice because of Jackson's and Maldonado's actions, under a theory of *respondeat superior*. Such a claim was not in Gunter's Second Amended Complaint, nor did the district court address such an argument. The only respondeat superior argument made below was against the Public Defendants for Gunter's § 1983 claims, which the district court correctly rejected, as "the doctrine of *respondeat superior* has no application under § 1983." *Gunter*, 2021 WL 965035, at *7 (cleaned up) (quoting *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985)). Having not made *respondeat superior* argument for medical malpractice against Southern Health below, Gunter cannot raise it now on appeal. *See, e.g.*, *Richardson v. Clarke*, 52 F.4th 614, 625 (4th Cir. 2022).

44

*superior* theory for the first time on appeal in his medical-malpractice claim against Southern Health Partners.

I'll start with Gunter's § 1983 claim before turning to his medical-malpractice claim.

## A.    Section 1983

Gunter's § 1983 claim differs between the two sets of Defendants. He alleges that Jackson and Maldonado's actions during his jail stint amount to deliberate indifference in violation of the Constitution. And he separately alleges that Davie and Stokes Counties have policies that, when followed, fail to provide adequate medical care and also violate the Constitution. I would vacate and remand the grant of summary judgment as to the former, but I would affirm the latter.

### 1.    Deliberate Indifference from Jackson and Maldonado

Gunter claims that Jackson and Maldonado knew about his mechanical heart valve and his need for daily Coumadin but acted with deliberate indifference in failing to provide timely medication. In assessing Gunter's § 1983 claim, the district court applied an outdated standard for pretrial detainees' deliberate-indifference claims. That outdated standard was the same one applied to convicted prisoners, requiring a plaintiff to show that jail officials *subjectively* "knew of and disregarded an excessive risk to inmate health or safety." *Scinto*, 841 F.3d at 225 (cleaned up) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Two years after the district court's decision, however, this Court decided *Short v. Hartman*, 87 F.4th 593 (4th Cir. 2023). *Short* clarified that the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015) distinguished pretrial detainees from prisoners, replacing the subjective standard with an *objective* standard for deliberate-

45

indifference claims brought by the former. *Short*, 87 F.4th at 605–06. Thus, "[n]ow, it is sufficient that the [pretrial-detainee] show that the defendant's action or inaction was, in *Kingsley*'s words, 'objectively unreasonable.'" *Id.* at 611 (citing *Kingsley*, 576 U.S. at 397). No subjective intent or knowledge by the jail officials is needed.[6]

The district court granted summary judgment to Jackson and Maldonado on Gunter's § 1983 claim because Gunter could not show evidence of subjective intent or knowledge. Without the benefit of our decision in *Short*, the district court did not consider whether their actions were "objectively reasonable." I would thus "remand without considering anything further" and leave it to the district court to apply the proper standard in the first instance. *Short*, 87 F.4th at 612.

### 2. Davie and Stokes Counties

Gunter's second § 1983 claim is against Davie and Stokes Counties. Although municipalities like the Counties cannot be liable under § 1983 for the actions of their employees and agents, they can be independently liable for their own policies and customs. *See Los Angeles Cnty. v. Humphries*, 562 U.S. 29, 32–33 (2010) (citing *Monell*, 436 U.S.

---

[6] Though the district court is not at fault, we nevertheless assess Gunter's claim under the new law. *See Henderson v. United States*, 568 U.S. 266, 271 (2013) ("The general rule is that an appellate court must apply the law in effect at the time it renders its decision" (cleaned up) (quoting *Thorpe v. Housing Auth. of Durham*, 393 U.S. 268, 281 (1969)). The parties do not catch the intervening change in law and do not address it in their briefs. As such, Gunter still couches his objection as an Eighth Amendment claim, though as a pretrial detainee he's governed by the less demanding standard of the Fourteenth Amendment. Because the difference didn't matter in this circuit before *Short*, I agree with the Majority that we should construe Gunter's deliberate-indifference claim as properly arising under the Fourteenth Amendment.

at 694)).  To prove this "*Monell* liability," plaintiffs must show that their harm was "caused by a constitutional violation," and that the municipality's policies were "the moving force" behind that violation.  *Washington v. Housing Auth. of Columbia*, 58 F.4th 170, 177, 184 (4th Cir. 2023) (quotation omitted).  Gunter challenges four sets of ostensible County policies:  (1) the decision to enter a contract with SHP to provide medical care in county jails, (2) the decision to understaff the medical personnel at the county jails, (3) the failure to prepare adequate transfer and discharge paperwork, and (4) the failure to recognize anticoagulation therapy as a serious medical condition.  Opening Br. at 47–48.  The Majority addresses the alleged understaffing policy and invents an additional "custom," not included in the briefs, of "taking days to get inmates their medication."  Maj. Op. at 21. None are sufficient for *Monell* liability here.

All of Gunter's *Monell* arguments rise and fall with his allegation that the Counties have a "policy" of contracting with SHP to provide medical care in county jails.  Gunter argues that because the Counties hired SHP "to fulfill their duty to provide medical care to inmates, the policies of [SHP] became the policies of the Counties," and therefore, the Counties are "directly responsible" for them.  Opening Br. at 40.  This is simply *respondeat superior* liability in a poor disguise.  And *Monell* itself prohibits imposing such liability: "[A] municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell* 436 U.S. at 691.  The decision to hire an outside medical supplier, without more, does not render a county liable under *Monell* for an "injury inflicted solely by its employees or *agents*."  *Id.* at 694 (emphasis added).

47

Rather than being liable for its agent's actions, a municipality is responsible under § 1983 only for its own actions—"when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.* at 694. An actual county policy or custom may serve as the basis for a *Monell* claim. But simply hiring a third-party agent does not demonstrate a dereliction of duty if the agent fails to perform adequately. And the mere existence of a contract between the Counties and its agent does not suggest the Counties adopt as their own policy any error that the agent makes.[7]

Beyond gesturing at municipal responsibility for its agent's errors, Gunter does allege two plausible municipal policies. First, he alleges that the County decided, as a matter of policy, to understaff their jails. If true, that might be a cognizable municipal policy. But Gunter fails to show how such understaffing could possibly be the "moving force" behind his lack of Coumadin. As all agree, Nurse Jackson conducted his initial intake screening at Davie County. Indeed, a key part of Gunter's medical-malpractice claim centers on Jackson's actions at this screening and Maldonado's actions the next day. While Nurse Hunt had gone home for the weekend when Gunter arrived at Stokes County,

---

[7] The Majority relies on the Supreme Court's opinion in *West v. Atkins*, 487 U.S. 42 (1988). But that case did not extend *Monell* liability. *Atkins* simply held that a "physician who is under contract with the State to provide medical services to inmates at a state-prison hospital on a part-time basis acts 'under color of state law,' within the meaning of 42 U.S.C. § 1983." *Id.* at 43. In fact, the *Atkins* Court cites *Monell*'s rejection of *respondeat superior* § 1983 claims in its reasoning, noting that if it did not find prison physicians could be held personally liable under § 1983, "it would greatly diminish the meaning of a prisoner's Eighth Amendment right, since few of those with supervisory and custodial functions are likely to be involved directly in patient care" and "§ 1983 liability is not available under the doctrine of *respondeat superior*." *Id.* at n. 12.

she testified that it was part of her job to handle intake and medication for transfers even after she had left, and Gunter does not allege that her physical presence would have changed the availability of Coumadin. So neither Jackson and Maldonado's affirmative treatment nor Hunt's procurement difficulties were related to the level of staffing at the jails.

The second alleged policy, a failure-to-prepare-transfer-and-discharge-paperwork policy, suffers from the same problem. To the extent that the lack of paperwork during Gunter's transfer from Davie to Stokes County jail was indicative of a policy and not a one-off mistake, it was unrelated to his failure to receive Coumadin. Hunt testified that Gunter's lack of Coumadin his first weekend at Stokes County jail was due to her inability to procure Coumadin from the pharmacy on short notice, not because of any missing paperwork.[8] And while the record does not show that Gunter received any discharge paperwork regarding his medication plan upon his release from Stokes County jail, such an event postdates Gunter's time in jail and therefore cannot be the "moving force" of any injuries sustained then.

There is also no evidence that the Counties adopted an official policy of not taking coagulation treatment seriously. Even assuming medical staff did not take Gunter's condition seriously in this case, those actions in isolation are not enough to show a County-

---

[8] A separate and perhaps more fundamental flaw with Gunter's transfer paperwork argument is that the record actually contains the transfer form with Maldonado's prescribed Coumadin regimen prepared by Nurse Jackson. And Hunt confirmed that Stokes County jail should have received the transfer form when Gunter arrived. So it is implausible that the Counties have a no-transfer-paperwork policy in the first place.

wide policy of not taking these conditions and medications seriously. *See Est. of Jones v. City of Martinsburg*, 961 F.3d 661, 672 (4th Cir. 2020) ("Because *Monell* liability cannot be predicated on a theory of *respondeat superior*, a single incident is almost never enough to warrant municipal liability."). Gunter does not provide any evidence that failure to treat coagulation disorders seriously is widespread. Nor would it suffice to merely claim that the alleged medical error—taking several days to get medication to a patient—was somehow a "policy" or "custom" of the County. Yet even though Gunter never alleged that policy or custom, the Majority adopts it as the County's without any evidentiary support. We should not on appeal create a county policy that Gunter does not even allege existed. And we certainly should not do so when the alleged "policy" or "custom" is merely a restatement of the isolated medical error.

Without any plausible causal connection between any municipal policy and Gunter's injuries, I would affirm the grant of summary judgment as to the Counties.

## B.      Medical Malpractice

The second issue, Gunter's medical-malpractice claim, lies at the intersection of state and federal law. The medical-malpractice cause of action itself arises under state law. *See Fitzgerald v. Manning*, 679 F.2d 341, 346 (4th Cir. 1982); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). So we look to North Carolina law for the substantive elements of his claim. In medical-malpractice actions, North Carolina requires the plaintiff to show: "(1) the applicable standard of care; (2) a breach of [the] standard of care by the defendant; (3) the injuries suffered by plaintiff were proximately caused by [the] breach; and (4) the

damages result[ed] to the plaintiff." *Weatherford v. Glassman*, 500 S.E.2d 466, 468 (N.C. App. 1998).

The sole issue on appeal is an aspect of the third element. Gunter attempted to prove proximate causation by proffering three pieces of evidence from two medical experts: the testimony of Dr. Yoder, the testimony of Dr. Laber, and a follow-up declaration by Dr. Laber.[9] Though the element of proximate causation comes from North Carolina law, federal evidence law governs whether the expert evidence is admissible. *Owens by Owens v. Bourns, Inc.*, 766 F.2d 145, 149–50 (4th Cir. 1985). To be admissible, their opinions must be both "grounded in facts that justify" them and put forth with "a 'reasonable degree of medical certainty' that it was more likely that the defendant's [action] was the cause than any other cause." *Id.* (quoting *Fitzgerald*, 679 F.2d at 350); *see also* Fed. R. Evid. 702(a), (b), (d).[10] Without satisfying both requirements, the experts' statements will be excluded and cannot raise an issue for the jury. *Id.* at 150. The district court's evidentiary gatekeeping role thus exists even for state medical-malpractice claims.

The district court decided that all three pieces of evidence from Gunter's medical experts were inadmissible. Then, having excluded Gunter's evidence, the district court

---

[9] Gunter also alleges, as a separate, fourth evidentiary matter, that the district court abused its discretion by not permitting Gunter to depose Dr. Julie Sease, the Medical Defendants' expert witness. But Gunter's untimely motion to depose Dr. Sease, filed 11 days post-discovery, was reasonably denied. *See Spencer Med. Assocs. v. Comm'r*, 155 F.3d 268, 273 (4th Cir. 1998).

[10] Though not the only requirements for admitting expert testimony, *see Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 592–94 (1993); Fed. R. Evid. 702, they are the relevant two here.

51

concluded that he had not presented a genuine dispute of material fact on the question of whether his medical treatment in jail proximately caused his blood clots. The district court's grant of summary judgment followed. The propriety of summary judgment thus depends on the upstream exclusion of Gunter's expert evidence. So we focus on the district court's evidentiary exclusion, which we review for abuse of discretion. *Wickersham v. Ford Motor Co.*, 997 F.3d 526, 531 (4th Cir. 2021).

I believe that all three pieces of evidence should have been considered. And once considered, the evidence creates a genuine dispute of material fact that precluded the grant of summary judgment. So like the Majority, I would reverse. But I would take a different path.

The evidentiary standard for expert testimony should be applied to the testimony at issue *before* the summary judgment standard. *See* Fed. R. Civ. P. 56(c)(2) (stating that evidence used to oppose summary judgment must be "presented in a form that that would be admissible in evidence"). So the district court first settles the universe of admissible facts, and then the district court decides the summary judgment motion on those facts.

The Majority instead immediately jumps to a summary judgment analysis, holding that the district court improperly weighed the evidence. This is the wrong approach. First, I would address the evidentiary standard, concluding that the district court incorrectly applied the "reasonable degree of medical certainty" evidentiary standard in excluding Dr. Yoder and Dr. Laber's testimony. Only then would I address the summary judgment standard, concluding that, based on the admissible testimony, a genuine dispute of material

52

fact exists regarding proximate cause. Following this path, I would conclude that the district court erred in granting summary judgment.

### 1.      Dr. Yoder and Dr. Laber's Testimony

The district court excluded Dr. Yoder's and Dr. Laber's testimony on the same three grounds. First it believed that both doctors relied on an unjustified factual assumption that "Plaintiff had been properly anticoagulated prior to entering the jail" by consistently taking his medication. *Gunter*, 2021 WL 4255370, at *23. Second, the district court believed that the temporal proximity between the Medical Defendants' actions and Gunter's subsequent blood clots could not provide a justifiable factual basis for the doctors' causation conclusion. And third, the district court believed that both doctors' testimonies lacked specificity and were therefore "the product of conjecture," not reasonable medical certainty. *Id.* at *25. All three grounds are mistaken.

To begin with, on the first ground, it's not clear that either doctor's proximate-cause opinion relied on an assumption that Gunter took Coumadin consistently before entering jail.[11] But even if both doctors based their proximate cause determination on the

---

[11] During her deposition, Dr. Yoder was directly told to "assum[e] that [Gunter] wasn't compliant with his Coumadin dosages" prior to jail and was then asked whether she still believed that his jail stint proximately caused his injuries. J.A. 2605. She answered in the affirmative, stating that "it's the timing [of the jail stint] . . . that makes it suspect." J.A. 2607. And Dr. Laber was explicitly asked whether he attributed the proximate cause of Gunter's blood clots to the Medical Defendants because he was "assuming that Mr. Gunter took his medication every day for the 30 days before he was incarcerated," and Dr. Laber responded, "No. I am not." J.A. 2759.

Admittedly, other aspects of the doctors' testimonies create some ambiguity as to their assumptions. Dr. Yoder's testimony in particular is potentially contradictory. "Q: Now, are you – are you assuming in your opinion that these missed dosages [in jail] caused (Continued)

assumption that that Gunter consistently took his medication before his incarceration, they had justifiable—if disputed—factual bases to do so. Evidence, referenced by both doctors in their depositions, supports the assumption that Gunter consistently took his medication. Gunter filled a 30-day Coumadin prescription, written by Dr. Yoder, like clockwork on June 25, July 24, and August 23, 2012. That gave him adequate medication through September 22. The record does not show any further prescription refills, leaving a month-and-a-half gap before Gunter's arrest on November 6. But pharmacy records from a local Walgreens show that Gunter obtained multiple emergency Coumadin doses in September, October, and November, sufficient to cover his daily doses for a large portion of the gap. As for the rest of the gap, Gunter asserted that he had access to a stash of leftover Coumadin that he had accumulated over years and years of prescriptions.[12] Taking Gunter's statements as true (as we must), there were ample reasons for Dr. Yoder and Dr. Laber to assume that Gunter was consistently taking his medication prior to his arrest.

---

his blood clot, that he took his prescribed dosages on all the other days in November that he's not incarcerated? A: That would be the assumption." J.A. 2604. This exchange occurs just before Dr. Yoder was told to assume Gunter did not consistently take his medication prior to incarceration.

[12] Dr. Yoder's preexisting relationship with Gunter as his treating physician also supported a belief that Gunter told the truth about his medication compliance, particularly since Dr. Yoder had regularly checked Gunter's INR while treating him. And Dr. Laber, who specializes in hematology and treats patients with blood clots regularly, could draw upon his experience with patients who had mechanical heart valves installed when they were children to conclude that they consistently take their anticoagulation medication. *See* Fed. R. Evid. 703, Advisory Comm. Note ("[A] physician in his own practice bases his diagnosis on information from numerous sources and of considerable variety, including statements by patients and relatives . . . . [Such] validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes.").

On the second ground, I would find that the doctors could reasonably rely on temporal proximity as a factual basis to justify attributing the proximate cause of Gunter's injuries to his time in jail. Dr. Yoder stated that her proximate-cause determination was due to the "consistency of inconsistent dosing [in jail] and the timing of the missed doses and the presentation of symptoms." J.A. 2601. Dr. Laber said much the same, explaining that he attributed Gunter's injury to his time in jail "[b]ecause of the timing" of the two events. J.A. 2774. Regardless of their accuracy, which is not at issue on summary judgment, these were sensible answers.

The district court believed the doctors could not rely on temporal proximity because "the mere fact that two events correspond in time does not mean that the two necessarily are related in any causative fashion." *Gunter*, 2021 WL 4255370, at *24 (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 265 (4th Cir. 1999)). And it's true that mere temporal proximity between two events does not demand a causal relationship. After all, correlation is not causation. But that does not mean that the temporal proximity between two events is immaterial to medical causation.

A medically causal relationship can be established when temporal proximity exists between two events that in the abstract have an established causal relationship.[13] Consider a pair of examples. If I eat a burger, eat nothing else that day, and then a few hours later

---

[13] In contrast, a causal relationship cannot be derived from temporal proximity when there is otherwise no apparent relationship between the two events. *See, e.g.*, *Rohrbough v. Wyeth Laboratories, Inc.*, 916 F.2d 970, 972–74 (4th Cir. 1990) (excluding medical-expert testimony grounded solely in temporal proximity where no causal relationship between the DTP vaccine and seizures was asserted).

55

I'm hospitalized with a broken leg, it would be nonsensical to attest that my broken leg was caused by the burger. An expert would not be able to establish with a reasonable degree of medical certainty that the burger caused my broken leg; there is no causal relationship between eating food and breaking one's leg. But if I eat a burger, eat nothing else that day, and then a few hours later I'm hospitalized with *food poisoning*, suddenly it is quite reasonable to attest that my food poisoning was caused by the burger. An expert could justifiably testify with a reasonable degree of medical certainty that the burger caused the food poisoning by explaining that food poisoning usually manifests itself within 24 hours. The difference, of course, is that the causal relationship between the two kinds of events—eating food and getting food poisoning—is known and obvious.

Here, it is known and obvious that a lack of anticoagulation medication in a patient with a mechanical heart valve has an established causal relationship with getting blood clots. On this point, abundant medical literature—as well as the parties—agree. Since that relationship is well-understood in the abstract, the temporal proximity between Gunter's jail stint and his blood clots gave Dr. Yoder and Dr. Laber a sufficient factual basis to causally connect the two events in this specific circumstance.

Turning to the third ground for excluding these experts' testimonies, the district court believed that their asserted medical opinions lacked the specificity required for medical certainty, describing both as "conjecture." *Id.* at *25. But this Court does not require "pinpoint" accuracy for a medical opinion to be asserted with a reasonable degree of medical certainty. *Large v. Bucyrus-Erie Co.*, 707 F.2d 94, 97 (4th Cir. 1983). True, Dr. Yoder could not specify the exact "percentage" that Gunter was "at fault" for his own

56

injury, and Dr. Laber "could not quantify the increase in risk where a patient misses three consecutive days of Coumadin." *Gunter*, 2021 WL 4255370, at *24–25.  But their inability to ascribe specific numbers to Gunter's situation is not fatal to their medical opinions—in fact, it is entirely expected.  Determining the cause of a complex medical event seldom admits of surgical exactitude.  Giving any numerical answer—20%, 80%, 61.73%—would inherently have been an exercise in faux precision, and the doctors did not need to do so to assert their opinions with a reasonable degree of medical certainty.  It was enough for them to express that they believed Gunter's jail stint was more likely than not the proximate cause of his blood clots.

There were no legally supported reasons to exclude Dr. Yoder and Dr. Laber's deposition testimonies.  Their statements were grounded in facts that sufficiently justified their proximate cause determinations, and they asserted those determinations with a reasonable degree of medical certainty.  By concluding otherwise, the district court abused its discretion.

### 2.      Dr. Laber's Follow-Up Declaration

The district court also excluded Dr. Laber's follow-up declaration, which supplemented his deposition testimony, on the grounds that it "expressly contradict[ed] his findings in his deposition." *Id.* at *12.  A court may strike an affidavit as creating a "sham issue of fact" when it contradicts earlier deposition testimony. *See Rohrbough*, 916 F.2d at 975.  This prevents parties from manufacturing genuine issues of material fact through later-submitted documents. *Id*. at 976.  While the district court's understanding of the sham affidavit rule is correct, it is mistaken to apply the rule to the Laber Declaration.

57

The district court understood the Laber Declaration to "put forth a *new theory* of proximate cause" for Gunter's injuries. *Gunter*, 2021 WL 4255370, at \*12 (emphasis added). It believed that Dr. Laber stated in his deposition that Gunter's blood clots were caused by "a lack of anticoagulation generally," while it took the Laber Declaration to assert that the clots were caused by the "underdosing of medication" during Gunter's jail stint. *Id.* The district court found that the declaration's underdosing theory "[was] not explaining how lack of anticoagulation generally caused Plaintiff's injuries," but was instead a separate and contradictory theory. *Id.*

I see no contradiction; Dr. Laber's two theories appear to say the same thing. Even just taking both statements on their own, the "lack of anticoagulation" mentioned during the deposition most clearly refers to the lack of anticoagulation *medication*. Indeed, given that medication is the only method mentioned for anticoagulating Gunter's blood, it's unclear what else it could be referring to. And that fully aligns with the declaration's statement regarding the jail's "underdosing of *medication*."

In context, it is even clearer that the phrase "lack of anticoagulation generally" referred to Gunter's insufficient medication during his time in jail. During his deposition, Dr. Laber made multiple comments explaining that he thought the Medical Defendants caused Gunter's blood clots by failing to give Gunter enough anticoagulation medication. He stated that "[Gunter] was supposed to get 7.5 milligrams, and he did not. And it took days until he could get the right dose. So some days were skipped. Some days [were] underdosed. So—[] that is the responsibility of the jail." J.A. 2747. At another point, Dr. Laber ticked through the missed and low doses, identifying when the Medical Defendants

58

failed to give Gunter medication. And Dr. Laber stated toward the end of the deposition that the Medical Defendants engaged in "inappropriate care" because "[Gunter] was not bridged [with Lovenox]. He was not tested immediately. He was not treated immediately." J.A. 2767. In light of these clarifications stating that Gunter's lack of anticoagulation was attributable to his lack of medication while incarcerated, the Laber Declaration did not put forth a new theory of proximate cause or otherwise contradicted his earlier testimony. So I agree with the Majority that the Laber Declaration should have been admitted.

### 3. Summary Judgment After Considering All Admissible Evidence

The district court granted summary judgment for Jackson and Maldonado after excluding the three pieces of evidence mentioned above. But once Dr. Yoder and Dr. Laber are understood to have proffered admissible testimony on the proximate cause of Gunter's injuries, a genuine dispute of material fact exists with each side's medical experts disagreeing with the other's.[14] When experts reasonably disagree about proximate cause, it is up to a jury to decide. *See Da Silva v. WakeMed*, 846 S.E.2d 634, 641 (N.C. 2020). In the end, I agree with the Majority that the district court's grant of summary judgment to Jackson and Maldonado on Gunter's medical-malpractice claim must be reversed.

\*          \*          \*

After being released from jail, David Gunter unfortunately suffered from two severe blood clots that required surgery. He subsequently sued a bevy of defendants who were

---

[14] This result is not affected by the district court's statements that the admission of the Laber Declaration would not change the district court's summary-judgment analysis. The deposition testimony alone is sufficient to create a genuine dispute of material fact. The declaration is simply confirmatory.

involved in his medical treatment during his time in jail. The district court granted summary judgment to all defendants on all claims. But the district court never assessed Gunter's § 1983 claim under the proper legal standard. And the proximate cause of Gunter's blood clots is a matter of genuine dispute once all admissible medical-expert testimony is considered. I would thus vacate and remand the grant of summary judgment on the § 1983 claim as to Jackson and Maldonado, reverse the grant of summary judgment on the medical-malpractice claim as to Jackson and Maldonado, and affirm all other aspects of the district court's decisions.